## PEOPLE'S UNITED BANK *v*. EDWARD KUDEJ
### (AC 33106)

DiPentima, C. J., and Alvord and Sheldon, Js.

Submitted on briefs January 13—officially released March 27, 2012

*Kristen L. Zaehringer* filed a brief for the appellant (defendant).

*David A. Lavenburg* filed a brief for the appellee (plaintiff).

434

ALVORD, J. The defendant, Edward Kudej, appeals from the decision of the trial court granting the application of the plaintiff, People's United Bank, for a prejudgment remedy of attachment against the defendant.[1] On appeal, the defendant claims that the court improperly found probable cause that a judgment in the amount of the prejudgment remedy sought would be rendered for the plaintiff. Specifically, the defendant claims that the court erred when it found sufficient evidence that a merger between the plaintiff and the original holder of a promissory note and personal guarantee had taken place and, thus, that the plaintiff had standing to enforce the note and guarantee. We affirm the judgment of the trial court.[2]

The following facts and procedural history are relevant to our disposition of the defendant's appeal. On August 20, 1995, Advanced Back and Neck Center of Massachusetts, P.C. (back and neck center) executed and delivered a security agreement covering all of the back and neck center's assets to the Bank of Western Massachusetts (Western). The defendant was then the vice president of the back and neck center. On the same date, the defendant executed and delivered a personal guarantee (guarantee) of all debts owed or later owing to Western from the back and neck center. The guarantee provided that, upon default by the back and neck center, the obligations of the defendant would be due forthwith and would be payable to Western without

[1] The grant or denial of a prejudgment remedy is a final judgment for purposes of appeal pursuant to General Statutes § 52-278*l* (a). *State* v. *Bacon Construction Co.*, 300 Conn. 476, 484, 15 A.3d 147 (2011).

[2] The defendant also claims that the court erred by finding that there was an assignment of the 1998 note and the guarantee to the plaintiff. Because we determine that there was probable cause to support the court's granting of the prejudgment remedy due to its finding that there was sufficient evidence of a merger, we need not address the defendant's second claim regarding assignment.

demand or notice. The guarantee also provided that the defendant's liability would be unlimited and that he would be liable for all costs and expenses in connection with enforcing the guarantee. Additionally, the guarantee stated that Western was not required to attempt collection from the back and neck center in the event of the back and neck center's default before initiating collection from the defendant.

On July 7, 1998, the back and neck center executed and delivered a promissory note (1998 note) to Western in which the back and neck center promised to pay the principal amount of $100,000. The note provided that the principal balance would be payable on demand and that the interest on the unpaid principal balance would be paid monthly. Both the 1998 note and the guarantee state that they are to be "governed by and construed in accordance with the laws of the Commonwealth of Massachusetts . . . ."

On February 5, 2007, Western, the back and neck center and Advanced Medical Group, Inc. (Advanced Medical), executed an assumption agreement wherein Western assented to the assumption of three notes including: the 1998 note, a note owed by the president of the back and neck center, Michael Spagnoli (Spagnoli note), and a note owed by another entity called Chiromed and Associates, Inc. (Chiromed note).[3] Spagnoli signed the assumption agreement in his personal capacity and as president of the back and neck center, Advanced Medical, and Chiromed and Associates, Inc. The assumption agreement also was signed by the vice president of Western, Kevin M. Bowler.

---

[3] The three notes assumed by Advanced Medical included the 1998 note, at that time totaling $100,327.41 plus per diem interest of $23.78, the Chiromed note totaling $22,952.52 plus per diem interest of $5.49, and the Spagnoli note totaling $5395.73 plus per diem interest of $1.22.

The plaintiff filed a prejudgment remedy application on May 24, 2010, and the court held a hearing on September 29, 2010. Bowler testified at the hearing that Western was a wholly owned subsidiary of Chittenden Corporation, a bank holding company. He further testified that, in January, 2008, Chittenden Corporation sold all of its stock to the plaintiff. According to Bowler's testimony, initially each of the Chittenden banks had maintained its own separate bank identity, but all were merged into the plaintiff in January, 2009. Payments had been made on the assumption agreement by either Spagnoli directly or by Advanced Medical, but payments ceased as of March, 2009. The defendant never made any payments on any of the notes or on the assumption agreement. Subsequently, the plaintiff initiated proceedings against Spagnoli and the defendant, respectively, including attaching certain of Spagnoli's investment accounts and attempting to recoup from certain of Spagnoli's business ventures and other property.

Bowler testified that, on the basis of voluntary and involuntary payments by Spagnoli, the plaintiff reduced the defendant's liability. Bowler calculated the principal balance remaining on the assumption agreement to be $83,529.65, but he prorated the amount owed by the defendant based on the payments by Spagnoli on the general assumption agreement account. According to Bowler's testimony, the prorated amount owed by the defendant came to $78,131.95, including interest but not including costs and fees totaling approximately $13,000.[4]

---

[4] The following colloquy took place upon redirect examination of Bowler:

"[The Plaintiff's Counsel]: What's the bottom line number there?

"[The Witness]: The bottom line principal balance, $83,529.65.

"[The Plaintiff's Counsel]: Okay. Now, before coming here today, you did a proration based on the payments, correct?

"[The Witness]: Correct.

"[The Plaintiff's Counsel]: All right. Would you explain to the judge what your thought process was in that proration?

Additionally, the parties stipulated to the following facts prior to the hearing on the prejudgment remedy application: the defendant never received notice of the assumption agreement prior to the time of execution; there was no action taken by Western to collect against the defendant until the present action; and there was no notice to the defendant that the back and neck center had defaulted on the 1998 note.

Following the prejudgment remedy hearing, the parties filed supplemental briefs on October 6, 2010, and October 20, 2010, as requested by the court. Thereafter, in a memorandum of decision issued January 21, 2011, the court found that the affidavit and testimony of Bowler were sufficient to establish the amount of the debt and that Western merged into the plaintiff. The court thus found that there was probable cause that a judgment in the amount of the prejudgment remedy sought would be rendered in favor of the plaintiff. The court also found that any defenses raised by the defendant were insufficient to overcome the court's finding of probable cause. The court thus granted the plaintiff's application for a prejudgment remedy of attachment in the full amount requested. This appeal followed.

The defendant argues that it was clear error for the court to find that the plaintiff provided sufficient evidence that a merger had taken place between Western

"[The Witness]: Well, my thought process was that [the defendant] would object to the consolidation, and therefore want some proration of the payments. . . .

"[The Plaintiff's Counsel]: And did you do an analysis, did you do a proration of payments?

"[The Witness]: Yes, I did.

"[The Plaintiff's Counsel]: And you used the numbers in the assumption agreement to determine the percentages of the consolidation based on the three obligations, [the] Spagnoli [note], [the] Chiromed [note], and [the] 1998 [note]?

"[The Witness]: Yes.

"[The Plaintiff's Counsel]: All right. So what was the percentage of the total consolidation of the 1998 note?

"[The Witness]: The 1998 note, the percentage was around 70 percent."

and the plaintiff. The defendant argues that, because the evidence of a merger was insufficient, the court should have concluded that the plaintiff lacked standing to enforce the 1998 note and the guarantee, and, therefore, there was not probable cause that a judgment in the amount of the prejudgment remedy sought would be rendered for the plaintiff. We disagree.

As a preliminary matter, we first address whether Connecticut or Massachusetts law applies, because the 1998 note and the guarantee contain choice of law clauses stating that they are to be governed by and construed in accordance with Massachusetts law. "Contracts clauses which require the application of the laws of other states upon breach or dispute are recognized as proper in Connecticut." (Internal quotation marks omitted.) *Zenon* v. *R. E. Yeagher Management Corp.*, 57 Conn. App. 316, 321, 748 A.2d 900 (2000). "The ordinary rule is that where a cause of action arising in another [s]tate is asserted in our courts, we look to the laws of that [s]tate to determine all matters of substance involved in it, but that matters of procedure are governed by our own law . . . ." *Broderick* v. *McGuire*, 119 Conn. 83, 101, 174 A. 314 (1934). Therefore, we are guided by Massachusetts substantive law in deciding the defendant's claims, but we must apply the procedural laws of Connecticut.

The defendant's jurisdictional argument is based on his claim that the court erred by finding sufficient evidence that a merger between Western and the plaintiff took place, and, therefore, the defendant contests the court's finding of probable cause. As a threshold matter, we set forth the standard of review with regard to issues of standing. "[T]he appropriate standard of review is a procedural issue and is governed by Connecticut law." *Zenon* v. *R. E. Yeagher Management Corp.*, supra, 57 Conn. App. 322; see *Montoya* v. *Montoya*, 280 Conn. 605, 612 n.7, 909 A.2d 947 (2006). "[A] party must have

standing to assert a claim in order for the court to have subject matter jurisdiction over the claim. . . . Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy." (Internal quotation marks omitted.) *American States Ins. Co.* v. *Allstate Ins. Co.*, 94 Conn. App. 79, 83, 891 A.2d 75 (2006), aff'd, 282 Conn. 454, 922 A.2d 1043 (2007).

The court never made a determination as to whether the plaintiff had standing, however, it did determine that the plaintiff had shown probable cause that a judgment in the amount of the remedy sought would be rendered in its favor. The court based this determination on its finding that the plaintiff was the successor in interest to the 1998 note and the guarantee and on its finding that the defendant had no valid defenses and had unconditionally guaranteed the 1998 note. The defendant challenges that ruling based on his claim that the plaintiff did not provide sufficient evidence at the prejudgment remedy hearing to prove that a merger had taken place between Western and the plaintiff. In our determination of whether the court properly found probable cause that the prejudgment remedy sought would be rendered for the plaintiff at trial, we must first determine whether the evidence was sufficient for the court properly to conclude that the plaintiff owned the 1998 note and the guarantee.

In determining whether the court properly found sufficient evidence that a merger had taken place, we are guided by the standards and legal principles relating to prejudgment remedies in Connecticut. "General Statutes §§ 52-278a through 52-278n establish the procedures and requirements for seeking a prejudgment remedy, which is defined as any remedy or combination

of remedies that enables a person by way of attachment, foreign attachment, garnishment or replevin to deprive the defendant in a civil action of, or affect the use, possession or enjoyment by such defendant of, his property prior to final judgment . . . . As these statutes make clear, a decision regarding an application for a prejudgment remedy is based on a preliminary hearing generally held long prior to a trial on the merits of the plaintiff's claims.

"The threshold issue to be decided at the prejudgment remedy hearing is whether . . . there is probable cause that a judgment in the amount of the prejudgment remedy sought . . . taking into account any defenses, counterclaims or set-offs, will be rendered in the matter in favor of the plaintiff . . . . General Statutes § 52-278d (a) (1). [Our Supreme Court] has clarified that prejudgment remedy hearings are not involved with the adjudication of the merits of the action brought by the plaintiff or with the progress or result of that adjudication . . . and therefore are independent of and collateral thereto and primarily designed to forestall any dissipation of assets by the defendant . . . . Although the attachment of a defendant's assets while an action is pending can have significant consequences, a probable cause determination rests on a low level of proof and a prejudgment remedy hearing generally is far more abbreviated than a trial on the merits." (Citations omitted; internal quotation marks omitted.) *State* v. *Bacon Construction Co.*, 300 Conn. 476, 483, 15 A.3d 147 (2011). The prejudgment remedy hearing is narrow in scope and "should not require the time or resources of a full blown trial." Id, 485.

"Proof of probable cause as a condition of obtaining a prejudgment remedy is not as demanding as proof by a fair preponderance of the evidence. . . . The legal idea of probable cause is a bona fide belief in the existence of the facts essential under the law for the action

and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it. . . . Probable cause is a flexible common sense standard. It does not demand that a belief be correct or more likely true than false. Under this standard, the trial court's function is to determine whether there is probable cause to believe that a judgment will be rendered in favor of the plaintiff in a trial on the merits.

"This court's role on review of the granting of a prejudgment remedy is very circumscribed. . . . In its determination of probable cause, the trial court is vested with broad discretion which is not to be overruled in the absence of clear error. . . . In the absence of clear error, this court should not overrule the thoughtful decision of the trial court, which has had an opportunity to assess the legal issues which may be raised and to weigh the credibility of at least some of the witnesses. . . . [On appeal], therefore, we need only decide whether the trial court's conclusions were reasonable under the clear error standard." (Citations omitted; internal quotation marks omitted.) *TES Franchising, LLC* v. *Feldman*, 286 Conn. 132, 137–38, 943 A.2d 406 (2008).

Bowler testified that Western merged into the plaintiff, that he had at one point seen a page of the merger document, and that he used to work for Western but now, due to the merger, works for the plaintiff. Bowler also testified that he had physically held the note and that it was in the plaintiff's files due to the merger. As noted previously, the court had broad discretion to determine whether probable cause existed, and its determination rested on the plaintiff's meeting a low burden of proof. The court credited Bowler's testimony that the merger took place and found his testimony, in conjunction with the 1998 note, the guarantee, the

assumption agreement and Bowler's affidavit, to be sufficient evidence of that fact. "Weighing the evidence and judging the credibility of the witnesses is the function of the trier of fact and [appellate courts] will not usurp that role." (Internal quotation marks omitted.) Id., 143. We decline to usurp the court's weighing of the evidence and its determination of the credibility of the witness in the present case. The court properly determined that the evidence provided by the plaintiff, in the context of the very low burden of proof required in a probable cause hearing, was sufficient to show that a merger had taken place.

The court rested its determination of probable cause on its finding that the merger had taken place and that, therefore, the plaintiff had standing to enforce the 1998 note and the guarantee. Before we can determine whether the court properly concluded that the plaintiff had standing to enforce the 1998 note and the guarantee, we must first set out the substantive law of Massachusetts as it relates to the transfer of the rights and liabilities of a bank in a merger. Merger of banks is governed by statute in Massachusetts. Specifically, Mass. Gen. Laws c. 168, § 34B governs the merger or consolidation of savings banks and thrift institutions.[5] Pursuant to

[5] Bowler testified that the plaintiff is a thrift institution; however, we note that the applicable laws as regarding the rights and liabilities of a bank or thrift institution following a merger are the same, regardless of whether the merger was conducted under Mass. Gen. Laws c. 168, § 34B or under another merger statute in Massachusetts.

For instance, Mass. Gen. Laws c. 168, § 34, which governs the merger or consolidation of one savings bank with another savings bank, is almost identical to § 34B and provides·in relevant part: "The corporate existence of all but one of the consolidating corporations shall be discontinued and consolidated into that of the remaining corporation, which shall continue. All and singular the rights, privileges and franchises of each discontinuing corporation and its right, title and interest to all property of whatever kind, whether real, personal or mixed, and things in action, and every right, privilege, interest or asset of conceivable value or benefit then existing which would inure to it under an unconsolidated existence, shall be deemed fully and finally, and without any right of reversion, transferred to or vested in the continuing corporation, without further act or deed, and such continuing

that statute, after a merger or consolidation has taken place, the new entity becomes a successor in interest with regard to all existing rights and liabilities, simply stepping into the shoes of its predecessor. See *New Bedford Institution for Savings* v. *Gildroy*, 36 Mass. App. 647, 650 n.3, 634 N.E.2d 920, review denied, 418 Mass. 1106, 639 N.E.2d 1082 (1994). The statute provides in relevant part: "All and singular the rights, privileges and franchises of each discontinuing institution and its right, title and interest to all property of whatever kind, whether real, personal or mixed, and things in action, and *every right, privilege, interest or asset of conceivable value or benefit then existing* which would inure to it under an unconsolidated existence, *shall be deemed fully and finally, and without any right of reversion, transferred to or vested in the continuing institution, without further act or deed,* and such continuing institution shall have and hold the same in its own right as fully as if the same was possessed and held by the discontinuing institution from which it was, by operation of the provisions hereof, transferred, and other provisions of law relative to limitations on the number of directors, corporators or trustees and on the investment of funds of such institutions shall not apply. . . ." Mass. Gen. Laws c. 168, § 34B. (Emphasis added.)

corporation shall have and hold the same in its own right as fully as if the same was possessed and held by the discontinuing corporation from which it was, by operation of the provisions hereof, transferred, and other provisions of law relative to limitations on the number of corporators or trustees and on the investment of funds of such corporations, and shall not apply. . . ."

This language is applied consistently in the Massachusetts statutes relating to merger or consolidation. The exact statute is immaterial to our disposition of the defendant's claim. See *New Bedford Institution for Savings* v. *Gildroy*, 36 Mass. App. 647, 650 n.3, 634 N.E.2d 920 ("[a]lthough no relevant documents reflecting [the type of transaction] are in the record, it appears to have been a consolidation pursuant to either [Mass. Gen. Laws ] c. 168, § 34, or § 34D, under either of which [the plaintiff] would be deemed a successor in interest which simply 'stepped into the shoes' of [the original holder of the note] with respect to all existing rights and liabilities"), review denied, 418 Mass. 1106, 639 N.E.2d 1082 (1994).

Therefore, under the law of Massachusetts, when one bank merges with another bank, every right, privilege, interest or asset of conceivable value or benefit then existing is transferred to the new entity *without further act or deed.* Mass. Gen. Laws c. 168 § 34B. The court properly found sufficient evidence that a merger took place between Western and the plaintiff. Once the two entities merged, the 1998 note and the guarantee transferred from Western to the plaintiff by operation of law. As a successor in interest, the plaintiff possesses a real interest in the cause of action and a legal interest in the subject matter of the controversy. Therefore, the plaintiff has standing to enforce the 1998 note and the guarantee against the defendant. Accordingly, we conclude that the court did not commit clear error when it found that the plaintiff provided sufficient evidence that a merger had taken place between Western and the plaintiff and that there was probable cause that a judgment would be rendered in favor of the plaintiff in the amount of the prejudgment remedy sought.

The judgment is affirmed.

In this opinion the other judges concurred.