2013 OK 85

**LINCOLN FARM, L.L.C.,**
Plaintiff/Petitioner,

v.

**Donald L. OPPLIGER; Joi M. Oppliger; Farming Technology Corporation; and Farming Technology, Inc.,** Defendants/Respondents.

No. 111018.

Supreme Court of Oklahoma.

Oct. 15, 2013.

Rehearing Denied Dec. 16, 2013.

Mark K. Stonecipher, Andrew L. Walding, Fellers Snider Blankenship Bailey and Tippens, P.C., Oklahoma City, Oklahoma, for Plaintiff/Petitioner, Lincoln Farm, L.L.C.

Raymond E. Zschiesche, Phillips Murrah, P.C., Oklahoma City, Oklahoma, for Defendants/Respondents, Farming Technology Corporation and Farming Technology, Inc.

Cheryl P. Hunter, James M. Chaney, Kirk & Chaney, Oklahoma City, Oklahoma, for Defendants/Respondents, Donald L. Oppliger and Joi M. Oppliger.

EDMONDSON, J.

¶ 1 The controversy framed by the parties involves whether Lincoln Farm, L.L.C., breached a contract to sell potatoes to Farming Technology Corporation, and whether certain provisions of the Uniform Commercial Code involving the unavailability of a carrier and a commercially impracticable method of delivery are applicable to the parties. Farming Technology argued in the trial court that Lincoln Farm was required to build a private rail spur in order to fulfill Lincoln Farm's contractual obligation to load potatoes on railcars or trucks furnished by Farming Technology Corporation to take delivery of the potatoes. We hold that the contract unambiguously states that Farming Technology Corporation will furnish railcars or trucks to take delivery of the potatoes, the contract does not state that Farming Technology has the right to insist on delivery solely by rail, and that the contract does not require the building of a private rail spur by Lincoln Farm in a circumstance where at the time the purchase agreement was made the

potatoes were being loaded on railway cars parked on the main line of the railway.

## I. The Controversy Before the Court

¶2 Donald and Joi Oppliger agreed on February 1, 2008, to sell their 18,800 acre farm in Nebraska to Redwolf Farms, L.L.C., and its permitted assigns. Redwolf Farms, L.L.C., was assignor to Lincoln Farm, L.L.C. (Lincoln Farm). The parties agreed that the Oppligers reserved the right to designate the physical purchaser and the sale price of the potatoes produced on the real property from the 2008 and 2009 crop years. A crop year is defined by the parties as the year in which the seeds of the crop are planted.

¶3 They agreed that income from the sale of potato crops would satisfy a certain amount payable to Lincoln Farm with additional amounts from the sale, if any, to be paid to the Oppligers. According to Lincoln Farm, one of the contract terms required the Oppligers to guarantee prices Lincoln Farm would receive in 2008 and 2009 for potatoes harvested from the Nebraska farm. This guarantee also provided that the Oppligers would select the purchaser and sale price of the crops.

¶4 Pursuant to the provisions of the agreement for the real estate purchase, the Oppligers designated Farming Technology Corporation (FTC) as the Buyer for the 2008 potato crop from the Seller of said crop, Lincoln Farm. The Oppligers' practice was to contract for the sale of their crops prior to their planting, and they had sold them to FTC for several years prior to the sale of the real property. The 2008 Purchase Agreement for the potato crop was executed on February 20, 2008, the same day that closing occurred on the real estate contract for the purchase of the potato farm.

¶5 The Nebraska Kansas Colorado Railway (NKCR) *allegedly* informed the Oppligers that their potato storage and loading facility encroached on the NKCR's property and that the encroachment must be removed from the NKCR property. For several years the NKCR had permitted the Oppligers to use the railway's main line for the purpose of loading potatoes on railway cars parked temporarily on the main line. It is also alleged that Don Oppliger received notice from the NKCR in 2007 for the need of a private spur line to continue loading potatoes on railway cars at the storage facility. FTC states on appeal that Don Oppliger informed Lincoln Farm in November 2007 that the NKCR "was going to require him to build a rail spur."[1] Lincoln Farm states in reply that Oppliger told it that *initially* the NKCR had informed Oppliger that a spur would be needed, but: "... this was not the case because he worked an arrangement with the railroad so that a rail spur was not required to be built at that time, and railcars could continue to be parked on the main line next to the Potato Building for loading.... Oppliger told his employees that rail spur would not be required ... He instructed them to re-build the load-out area so potatoes could be loaded directly from the Potato Building into railcars parked on the mainline ... [and] Oppliger knew, but failed to inform Redwolf or Lincoln Farm the arrangement with NKC Railway was only temporary."[2] FTC and Lincoln Farm do not contest that the 2007 potato crop was loaded on railway cars parked on the main line until some point shortly after May 6, 2008, and that on approximately June 9, 2008, Lincoln Farm was notified by the NKCR that railway cars would no longer be allowed to be parked on the main line for loading potatoes.[3]

¶6 In September 2008 a potato crop harvesting began. The crop contract between Lincoln Farm (Seller) and FTC (Buyer) contained the following.

(B) Seller warrants its is capable of harvesting and loading a minimum of 7,500 CWT. of potatoes per day. Buyer shall have no obligation to accept any potatoes not loaded by April 30, 2009.

---

1. FTC Answer Brief at 3.

2. Lincoln Farm's Reply Brief at 1–2.

3. "As early as June 9, 2008, Lincoln was advised by the NKCR that it would no longer allow Lincoln to load railcars on the main rail track from the potato storage facility." FTC's Answer Brief, at 5.

(C) Seller agrees to load potatoes on trucks or railcars furnished by Buyer.

(E) The approximate quantity of potatoes set out on page 1 will be delivered and piled by Seller into Seller's storage which is located in or near Wallace Nebraska. Seller will remove anything that will affect the flow of air through the potatoes. However, Buyer may at its option, load potatoes direct from the field.

O.R. at 221, 470.

¶7 When the harvest began, FTC rented railway cars which the NKCR parked in Nebraska off of the main line, but not in a location for direct loading of potatoes from the potato storage facility. The NKCR informed Lincoln Farm that the railway cars could not be loaded while parked on the main line, and Lincoln Farm informed FTC that it was ready to load potatoes on trucks supplied by FTC.

¶8 On October 23, 2008, FTC notified Lincoln Farm that "there were no alternatives under the 2008 Potato Contract other than for the potatoes to be loaded into railcars." Lincoln Farm understood that its contractual obligation could be satisfied by loading potatoes on either railway cars or trucks supplied by FTC. Lincoln Farm argued that the potato contract required it to deliver potatoes to a storage facility "to be piled and held there for loading 'on trucks or railcars furnished by Buyer [FTC].'" After the June 8th notice from the NKCR and before harvest began, Lincoln Farm started the process to build a private spur line, and insisted that it was not building the spur to satisfy any contractual agreement with FTC. The rail spur became operational by January 30, 2009, and potatoes were loaded by Lincoln Farm and shipped by FTC using this spur pursuant to the parties' agreement. The 2008 potato contract had a cutoff date of April 30, 2009, but FTC continued shipping potatoes "as long as the condition and quality of the potatoes are good." The last railway car of potatoes was shipped on May 21, 2009.

¶9 On June 18, 2009, Lincoln Farm sent its final invoice to FTC for $244,401. The invoice was not paid and Lincoln Farm brought an action in the District Court of Oklahoma County alleging that Farming Technology Corporation breached the contract. Farming Technology Corporation brought a counterclaim for breach of contract against Lincoln Farm. Farming Technology Incorporated (FTI), an entity owned by FTC, claimed that Lincoln Farm owed $82,774 to FTI for storage fees, switching charges, railway car payments for rail cars sent to Nebraska before the rail spur was operational.

¶10 Lincoln Farm sought summary judgment against Farming Technology Corporation and the Oppligers. FTC sought summary judgment against Lincoln Farm and stated that due to the rail spur not being available until January 30, 2009, it was necessary for it to "cover" the purchase of potatoes from third parties at an additional cost of $575,650.45, and that it was entitled to a judgment in that amount against Lincoln Farm. The trial court granted the motion for summary judgment sought by Farming Technology Corporation on the issue of liability, and denied the motion for summary judgment sought by Lincoln Farm. The trial court certified part of its order for discretionary interlocutory appellate review pursuant to the provisions of 12 O.S.2011 § 952(b)(3) and Supreme Court Rule 1.50.[4]

---

4. 12 O.S.2011 § 952(b)(3):

(b) The Supreme Court may reverse, vacate or modify any of the following orders of the district court, or a judge thereof: ...

3. Any other order, which affects a substantial part of the merits of the controversy when the trial judge certifies that an immediate appeal may materially advance the ultimate termination of the litigation; provided, however, that the Supreme Court, in its discretion, may refuse to hear the appeal ...

Oklahoma Supreme Court Rule 1.50 provides:

"Any interlocutory order not appealable by right under the statutes, which order affects a substantial part of the merits of the controversy, may be brought for review to this Court in compliance with the rules in this Part when the trial judge or the judge's successor has certified that an immediate appeal from that order may materially advance the ultimate termination of the litigation. In the exercise of its statutory discretion this Court may refuse to review a certified interlocutory order. 12 O.S.2011 § 952, Subdiv. (b)(3).

No certified interlocutory order shall be considered if taken from an order overruling a motion for summary judgment. See Rule 1.40 for

## II. Standard of Review, Scope of Review, and Choice of Law

¶ 11 The parties argue that the standard for appellate review of a summary judgment in Oklahoma applies herein. The standard applicable herein to review an order granting partial summary adjudication is *de novo* review similar to that provided on appellate review of a summary judgment.

¶ 12 Generally, a standard of appellate review is based, in part, upon the nature of the decision of trial tribunal and whether it adjudicated issues of fact, law, or mixed fact and law.[5] When in the exercise of our general appellate jurisdiction we review an adjudication of a pure question of law we review the issue *de novo*.[6] The nature of the order before us for review is not a summary judgment, but an interlocutory order anterior to judgment that is a partial summary adjudication on the issue of liability. A partial summary adjudication that determines the legal issue of liability necessarily includes an adjudication of the presence of those facts

necessary to sustain that adjudication; and like a summary judgment determination,[7] the facts necessary to sustain a partial summary adjudication on the issue of liability (1) must be not in controversy, (2) must not be of such a nature that reasonable individuals could reach different factual conclusions, and (3) all conclusions drawn from the evidentiary materials submitted to the trial court are viewed in a light most favorable to the party opposing the motion.[8]

¶ 13 Further, when a trial court exercises jurisdiction via summary process to adjudicate the merits of a cause of action and any defenses as a matter of law, the well-known respective burdens of the parties must be satisfied. For example, in the matter before us FTC sought, via summary process, adjudication on the merits of its cause of action that Lincoln Farm breached a contract.[9] Thus, FTC had the burden to prove those facts necessary to support each of the elements of a breach of contract claim.[10]

the application of other rules to review of a certified interlocutory order."

5.  *Christian v. Gray*, 2003 OK 10, ¶ 40, 65 P.3d 591, 608.

6.  *Christian v. Gray*, 2003 OK 10, at ¶ 41, 65 P.3d at 608.

7.  Summary judgment is appropriate only when it appears from the pleadings, affidavits, depositions, admissions or other evidentiary materials there is no substantial controversy as to any material fact and that one of the parties is entitled to judgment as a matter of law. *Tucker v. ADG, Inc.*, 2004 OK 71, ¶ 11, 102 P.3d 660, 665. Appellate review of a summary judgment may include assigned error that material facts are in dispute or yet not litigated, and that summary judgment was thus improperly granted. *Schulte v. Apache Corp.*, 1991 OK 61, 814 P.2d 469, 471 (parties did not sufficiently demonstrate that there was no genuine issue of material fact to warrant a final judgment, and the trial court erred when it granted a summary judgment); *Rader v. Farmers Insurance Co., Inc.*, 1997 OK 16, 934 P.2d 332, 334–335 (summary judgment was not proper when an issue of material fact was not litigated).

8.  *Woods v. Prestwick House, Inc.*, 2011 OK 9, ¶¶ 30, 32, 247 P.3d 1183, 1191–1192 (In the context of a motion for partial summary adjudication, we explained that all inferences and conclusions to be drawn from the underlying facts contained in the record are to be considered in

the light most favorable to the party opposing the motion, and that even when the basic facts are undisputed, the motion should be denied, if, under the evidentiary materials, reasonable individuals could reach different factual conclusions because the issue is a question for determination by the trier of fact.); *Embry v. Innovative Aftermarket Systems*, 2010 OK 82, ¶ 12, 247 P.3d 1158, 1161 (On review of a partial summary adjudication, we stated that all conclusions drawn from the evidentiary materials submitted to the trial court are viewed in a light most favorable to the party opposing the motion.); *Wofford v. Mental Health Services*, 1997 OK 116, 946 P.2d 1149, 1152 (Trial judge correctly ruled that the issue of liability was unresolved by an order granting partial summary adjudication because material facts necessary to adjudicate liability were disputed.). *Accord, Riffe Petroleum Co. v. Great Nat. Corp., Inc.*, 1980 OK 112, n. 26, 614 P.2d 576, 581 (An interlocutory summary adjudication is used when some of the facts in the case remain in controversy *while others are not*.)

9.  Summary judgment is an adjudication on the merits of the controversy. *Oklahoma Pub. Employees Ass'n v. Oklahoma Dep't of Central Servs.*, 2002 OK 71, ¶ 6, 55 P.3d 1072, 1076.

10. *Cinco Enterprises, Inc. v. Benso*, 1994 OK 135, 890 P.2d 866, 871 ("The party moving for summary judgment has the burden to prove the facts material to its claim and to show the absence of any factual dispute of the facts material to the

Only if FTC, as the movant for summary adjudication on its cause of action, satisfies the initial burden to show entitlement to summary adjudication is it incumbent on Lincoln Farm as the non-movant to demonstrate by its own submissions the existence of a substantial dispute as to some material fact.[11] Lincoln Farm has the burden to raise and prove each element of any affirmative defense interposed to defeat FTC's breach of contract cause of action.[12] The standard of appellate review of a trial court order granting partial summary adjudication is thus similar to that used when the Court reviews a summary judgment.[13]

¶ 14 Generally, the scope of our appellate review may be affected by the nature of the trial court's order reviewed, the nature of the appellate proceeding, the issues raised by the parties, and in the controversy before us the substantive law of Texas which is a choice of law issue presented by the parties.[14] Our review is limited to that part of the trial court's order which granted partial summary adjudication to FTC, and that part of the trial court's order denying summary judgment to Lincoln Farm is not before us. This is so because that part of the order granting FTC summary adjudication was the only part of the order certified for appellate review,[15] and on certified interlocutory review we do not review an order of a trial court that denies a motion for summary judgment.[16] Our review is limited to that part of the trial court's order that was certified and which affects a substantial part of the merits of the controversy.[17] Since this controversy is not a public-law controversy, the matters adjudicated on appeal are limited by the non-jurisdictional assignments of error[18] and issues raised by the parties.[19]

claim or defense ... [a] fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a claim or defense.").

11. *Head v. McCracken*, 2004 OK 84, ¶ 4, 102 P.3d 670, 674.

12. *Akin v. Missouri Pacific Railroad Co.*, 1998 OK 102, ¶ 9, 977 P.2d 1040, 1044.

13. In *Zaloudek Grain Company v. CompSource*, 2012 OK 75, ¶¶ 6–7, 298 P.3d 520, 522–523, the Court noted a standard of appellate review for a summary judgment in the context of the Court recasting an appeal to certified interlocutory review; and also explained that the issue presented involved statutory construction which demanded a *de novo* appellate review standard.

14. The scope of the Court's review should not be confused with the scope of the Court's remedial relief when reviewing a certified interlocutory order, which is similar to an appeal of a judgment, and includes the power to "reverse, vacate, or modify" the order just as it may reverse, vacate or modify a judgment or final order. 12 O.S.2011 § 952(a) & (b)(3). See § 952(b)(3).

15. When reviewing a *judgment* the Court may reverse, vacate, or modify any anterior intermediate order involving the merits of the action or any portion thereof. 12 O.S.2001 § 952(a). An immediately appealable-by-right interlocutory order which is not appealed or a non-appealable uncertified interlocutory order may thus be subject to appellate review on appeal from the subsequent judgment. Okla. Sup.Ct. R. 1.40(f). The denial of a motion for summary judgment does not fall within the class of interlocutory orders appealable by right nor could it be certified for review by certiorari in advance of judgment. *Eason Oil Co. v. Howard Engineering*, 1988 OK 57, 755 P.2d 669, 672.

16. *State ex rel. Bd. of Regents of Univ. of Oklahoma v. Lucas*, 2013 OK 14, ¶ 10, 297 P.3d 378, 384.

17. *State ex rel. Bd. of Regents of Univ. of Oklahoma v. Lucas*, 2013 OK 14, ¶ 6, 297 P.3d 378, 382–383; *Ward Petroleum Corp. v. Stewart*, 2003 OK 11, ¶ 1, 64 P.3d 1113, 1114; *City of Lawton v. Intern. Union of Police*, 2002 OK 1, n. 27, 41 P.3d 371, 376.

18. *Jackson v. Okla. Memorial Hosp.*, 1995 OK 112, 909 P.2d 765, 767 (Appellant's assignments of error in a petition in error are deemed amended by that party's appellate brief, and a party may include any error or issue presented to and resolved by the trial court which is supported by the record.)

19. Generally, appellate court review is limited to the issues raised by the parties. *Reddell v. Johnson*, 1997 OK 86, ¶ 6, 942 P.2d 200, 202; *Shero v. Grand Savings Bank*, 2007 OK 24, ¶ 3, 161 P.3d 298. Accord, *State v. Torres*, 2004 OK 12, ¶ 7, 87 P.3d 572, 578 (When a dispute presents a public-law controversy, the Court may grant corrective relief upon any applicable legal theory dispositive of the case, whether raised *sua sponte* or by a party, when the legal theory is supported by the record on appeal.); *Shorter v. Tulsa Used Equipment and Indus. Engine Services*, 2006 OK 72, n. 52, 148 P.3d 864, 873 (When resolving a public-law question, we are free to choose *sua sponte* the dispositive public-law theory although the wrong one is advanced.)

However, due to the parties' choice of law, issues addressed may include those treated as jurisdictional by a Texas court and raised *sua sponte* when applying *substantive* Texas law in a controversy of the nature that is before this Court.

¶ 15 Although the standard of appellate review is based upon Oklahoma's procedural law,[20] the parties' briefs contain numerous citations to statutes and court opinions from the State of Texas. The "2008 Purchase Agreement Nebraska Potato Crop" expressly provides that the law of the State of Texas shall apply to the construction of the contract: "This agreement shall be governed by and construed in accordance with the laws of the State of Texas and the applicable laws of the United States of America." 2008 Purchase Agreement Nebraska Potato Crop, at ¶ (M), O.R. 469, 471. The contract specifies that: "This agreement has been entered into and is performable in Harris County, Texas." *Id.* We apply the substantive law of the State of Texas to the controversy before us.

### III. Breach of Contract Claim and the Language of the Contract

¶ 16 Generally, in Texas the elements of breach of contract are (1) a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach.[21] On FTC's counterclaim it is cast in the role of a plaintiff and its motion for summary judgment must show these elements to be entitled to partial summary adjudication on the issue of liability. Most of Lincoln Farm's arguments on appeal are that it did not breach the potato sales contract.

¶ 17 In its motion for summary judgment, FTC states that it never advised Lincoln Farm that it had to build a rail spur.[22] FTC states that Lincoln Farm was unable to load any potatoes on railway cars until January 30, 2009, five months after it had *agreed to have potatoes available for loading on railway cars* provided by FTC. On appeal, FTC argues that it does not assert that the language of the contract required Lincoln Farm to build a spur, but that "under that contract Lincoln was required to deliver potatoes to FTC by loading them into railcars, which Lincoln's President admitted required a rail spur to be built off of the main track." [23] FTC's argument raises the issue of what was required "under that contract."

¶ 18 Lincoln Farm denied the allegation that completion and operational status of a rail spur was a material part of the basis of the bargain between the parties.[24] Although there is no allegation made by FTC concerning the *exact date* that Lincoln Farm was first told by the NKCR that a rail spur was needed for railway loading, FTC's motion for summary judgment states that "As alleged by plaintiff, at some point shortly after May 6, 2008, the NKC Railway discontinued its

20. *Consolidated Grain & Barge Co. v. Structural Sys., Inc.*, 2009 OK 14, n. 6, 212 P.3d 1168, 1170 ("Although a contract may be interpreted according to the law of the place where it is made and its performance is contemplated, the remedy available to enforce the contract is determined by the law of the forum."). *Accord, Flanders v. Crane Co.*, 1984 OK 88, 693 P.2d 602, 605 (In a tort matter we stated that "We begin our review of the trial court's summary judgment with the clear recognition that according to choice of law principles, Nebraska substantive law is controlling in the instant case. However, our own procedural law applies."); *People's United Bank v. Kudej*, 134 Conn.App. 432, 438, 39 A.3d 1139, 1143 (2012), quoting *Zenon v. R.E. Yeagher Management Corp.*, 57 Conn.App. 316, 321, 748 A.2d 900 (2000) ("The ordinary rule is that where a cause of action arising in another [s]tate is asserted in our courts, we look to the laws of that [s]tate to determine all matters of substance involved in it, but that matters of procedure are governed by our own law...."). We also note

that the parties' briefs agree that Oklahoma's procedural law applies in this appeal. We also note herein when those standards of appellate review used by Texas courts are the same as this Court when reviewing the issues presented by the parties herein.

21. *Crown Asset Mgmt., L.L.C. v. Loring*, 294 S.W.3d 841, 848 (Tex.App.-Dallas 2009, pet. denied); *Aquila Sw. Pipeline, Inc. v. Harmony Exploration, Inc.*, 48 S.W.3d 225, 235 (Tex.App.-San Antonio 2001, pet. denied).

22. "Neither FTC nor FTI ever advised plaintiff that it had to build a rail spur." FTC's Motion for Summary Judgment, O.R. at 403, 409.

23. FTC Answer Brief, at 12.

24. Plaintiff's Reply to Counterclaim, O.R. at 85, 88.

practice of allowing railcars to be loaded from the potato storage shed onto railcars placed on the main rail line. Instead, it notified plaintiff that it would be required to build a rail spur off of the main line." [25] Lincoln Farm alleges that notification from the NKCR occurred in June 2008.

¶ 19 One argument of FTC is that the contractual language requiring Lincoln Farm to load potatoes at the potato storage building on railway cars *necessarily* means that Lincoln Farm must provide a railway spur line for loading because such a spur was a reasonable condition for Lincoln Farm to fulfill its contractual obligation to load railway cars. The exact nature of this necessity in FTC's arguments must be noted. In its trial court Reply, FTC stated that "FTC has never contended that there is a provision in that contract which states that plaintiff must build a rail spur," and it echoes this position on appeal.[26] FTC's argument is based upon it equating a contractual duty of "loading" with legal "delivery," *and* that the method of delivery, trucks or railway cars, was solely at the option of FTC even if delivery by rail could not occur as it was contemplated at the time the contract was created in February 2008. On appeal, FTC also argues that "to the extent that Lincoln argues that this provision [concerning trucks and railcars]" is ambiguous, the intent of the parties governs when construing the contract and the nature of FTC's right to select the method of transportation. Because *some* of the parties' arguments are based in part upon whether the duty to build a spur is expressly or impliedly part of the contract and the nature of ambiguous and unambiguous terms in a contract, we first start with a review of implied terms in contracts by Texas courts before addressing the parties' arguments concerning how obligations relating to delivery were set forth in the contract.

¶ 20 As previously noted, the contract does not contain express language stating that Lincoln Farm must build a private spur line. We note that the agreement states that it is the "entire agreement among the parties . . . And may not be contradicted or varied by evidence or prior, contemporaneous, or subsequent oral agreements or discussions." Agreement, at ¶ (P). However, the Texas Commercial Code allows evidence of meaning of contract terms [27] and supplementation in the presence of ambiguity of the terms.[28] One issue presented is whether either FTC's sole discretion to select rail as a method of delivery or Lincoln Farm's obligation to build a spur are based upon the presence of ambiguity in the express language of the Agreement, and whether this ambiguity is the result of an omitted *implied term* in the contract that was contemplated by the parties but left unstated.

---

**25.** FTC's Motion for Summary Judgment, O.R. at 403, 406. This is consistent with Lincoln Farm's statement that it was informed "around June 9, 2008, that the NKCR no longer would allow railcars to be parked on the main track for loading." O.R. at 532. FTC also used the June 9th date. See note 3, *supra*.

**26.** Reply of Farming Technology, etc., O.R. 944, 947; appellate Answer Brief, at 12–13.

**27.** V.T.C.A., Bus. & C. § 2.202:

Final Written Expression: Parol or Extrinsic Evidence

Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

(1) by course of performance, course of dealing, or usage of trade (Section 1.303); and

(2) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

**28.** *Coldwell Banker Whiteside Assoc. v. Ryan Equity Partners, Ltd.*, 181 S.W.3d 879, 886 (Tex. App.-Dallas 2006, no writ) (When terms in a contract are not specifically defined, we give the terms their plain, ordinary, and generally accepted meaning.); *Donzis v. McLaughlin*, 981 S.W.2d 58, 61–62 (Tex.App.-San Antonio 1998, no pet.) (Generally, only where a contract is first determined to be ambiguous may the court consider the parties' intent or interpretation and admit extraneous evidence to determine the true meaning of the instrument.); *Monesson v. Champion Intern. Corp.*, 546 S.W.2d 631, 637 (Tex.Civ.App.-Tyler 1976, writ ref'd n.r.e.) (If a phrase is ambiguous, extrinsic evidence is admissible to show the intent of the parties, as well as custom or usage in the industry.).

¶ 21 A breach of contract has been defined as "a failure, without legal excuse, to perform any promise that forms the whole or part of a contract."[29] A contract may include implied terms, but Texas law does not favor an implied term or an implied covenant.[30] It is only in rare circumstances that a court will imply a covenant in a contract.[31] In 2003, the Supreme Court of Texas explained these views in *Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.*[32]

Generally, a court looks only to the written agreement to determine the obligations of contracting parties. *Sun Oil Co. v. Madeley,* 626 S.W.2d 726, 728 (Tex.1981). In rare circumstances, however, a court may imply a covenant in order to reflect the parties' real intentions. Obviously, courts must be quite cautious in exercising this power. *See Freeport Sulphur Co. v. Am. Sulphur Royalty Co. of Tex.,* 117 Tex. 439, 6 S.W.2d 1039, 1041 (1928). "The court cannot make contracts for parties, and can declare implied covenants to exist only when there is a satisfactory basis in the express contracts of the parties which makes it necessary to imply certain duties and obligations in order to effect the purposes of the parties in the contracts made." *Id.* at 1040. An "implied covenant must rest entirely on the presumed intention of the parties as gathered from the terms as actually expressed in the written instrument itself, and it must appear that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it...." *Danciger Oil & Refining Co. of Tex. v. Powell,* 137 Tex. 484, 154 S.W.2d 632, 635 (1941). Thus, a covenant will not be implied simply to make a contract fair, wise, or just. *Id.*[33]

This argument requires the contract language "Seller agrees to load potatoes on trucks or railcars furnished by Buyer" to be based upon an implied term that is a promise by Lincoln Farm to contract in the future with the NKCR for building a spur in time for the 2008 crop.

¶ 22 One issue involves when a promise by one party for future negotiation with a third party is enforceable pursuant to Texas jurisprudence. Generally, an agreement is judicially enforceable only if its terms are sufficiently definite to enable a court to understand the parties' obligations, and an agreement to make a future contract is legally enforceable only if it does not leave material terms open for future negotiation.[34] Texas law generally states that an agreement to negotiate in the future is unenforceable, even if the agreement calls for a good faith effort in the negotiations.[35] Such an agreement to negotiate is unenforceable because "[t]here would be no way by which the court could determine what sort of a contract the negotiations would result in, no rule by which the court could ascertain whether any, or, if so, what damages might follow a refusal to enter into such future contract."[36]

**29.** *Gilmore v. SCI Texas Funeral Servs., Inc.,* 234 S.W.3d 251, 259 (Tex.App.-Waco 2007, pet. denied); *IKON Office Solutions, Inc. v. Eifert,* 125 S.W.3d 113, 130 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (the failure to perform the terms of a contract is a breach of contract).

**30.** *Case Corp. v. Hi–Class Bus. Sys. of Am., Inc.,* 184 S.W.3d 760, 770 (Tex.App.-Dallas 2005, pet. denied); *Bank One, Tex., N.A. v. Stewart,* 967 S.W.2d 419, 434 (Tex.App.-Houston [14th Dist.] 1998, pet. denied); *Nalle v. Taco Bell Corp.,* 914 S.W.2d 685, 687 (Tex.App.-Austin 1996 writ denied).

**31.** *Gamma Group, Inc. v. Transatlantic Reinsurance Co.,* 242 S.W.3d 203, 212 (Tex.App.-Dallas 2007, pet. denied).

**32.** 121 S.W.3d 742 (Tex.2003).

**33.** *Universal Health Servs., Inc.,* 121 S.W.3d at 747–748.

**34.** *Fort Worth Ind. Sch. Dist. v. City of Fort Worth,* 22 S.W.3d 831, 846 (Tex.2000); *Martin v. Martin,* 326 S.W.3d 741, 749 (Tex.App.-Texarkana 2010, pet. denied).

**35.** *Radford v. McNeny,* 129 Tex. 568, 104 S.W.2d 472, 474–75 (1937); *Martin v. Martin,* 326 S.W.3d 741, 750–751 (Tex.App.-Texarkana 2010, pet. denied); *Meru v. Huerta,* 136 S.W.3d 383, 391 (Tex.App.-Corpus Christi 2004, no pet.); *John Wood Group USA, Inc. v. ICO, Inc.,* 26 S.W.3d 12, 21 (Tex.App.–Houston [1st Dist.] 2000, pet. denied); *Maranatha Temple, Inc. v. Enter. Prods. Co.,* 893 S.W.2d 92, 104 (Tex.App.-Houston [1st Dist.] 1994, writ denied).

**36.** *Radford v. McNeny,* 129 Tex. 568, 104 S.W.2d 472, 474–75 (1937).

Texas law states that a promise to do something in the future may be used to show a claim of fraud. But before a promise to do something

¶ 23 Of course, FTC argues that the term to be judicially enforced is a promise to load which necessarily requires a promise build a spur in time for the 2008 potato crop harvest as a reasonable condition for Lincoln Farm to fulfill, and the damages would be those FTC forth in its pleadings. However, we also note that whether such a promise for a future third-party contract as a reasonable condition may be enforceable against Lincoln Farm by FTC when (1) the record shows that at the time the contract was created Lincoln Farm was unaware that the railway would require a spur and such would be necessary for rail transport, and (2) the general legal principle that a railway is under no obligation to construct a spur to be located on private property and for private use.[37] In other words, may we say that in February 2008, it was the *unstated and assumed agreement* of the parties that Lincoln Farm would build a spur, if needed, in time for the 2008 potato crop harvest when the need for building the spur was unknown at that time and the building of such a spur was based upon the limitations of consent, time, and construction parameters that could be imposed by the NKCR, a non-party to the potato agreement? We think not.[38]

¶ 24 The record before us on summary adjudication shows that the 2008 crop agreement was drafted by FTC based upon earlier agreements FTC had with the Oppligers. The record before us also shows that Lincoln Farm was not informed until either after

May 6, 2008, or in June 2008, a few months after the execution of the agreement on February 20, 2008, that a rail spur would be needed to load the 2008 potato crop on railway cars at the facility. The record shows that in August 2008 Lincoln Farm had submitted a survey of its property and was waiting to receive documents to go forward with building a spur, and on October 31, 2008, was "working on getting the contract signed with the RR" to start construction of a spur. On these facts we cannot say that at the time the Purchase Agreement was made in February 2008, that Lincoln Farm building a rail spur for the 2008 crop was "so clearly within the contemplation of the parties that they deemed it unnecessary to express it" in that Agreement. We hold that the facts in the record fail to show that the building of a rail spur was clearly within the contemplation of the parties sufficient to be an implied term of the Agreement based upon partes' mutual intent at the time the Agreement was created. Similarly, the record before us on appeal from a summary adjudication contains nothing to show that a discretion by FTC to select rail delivery as the only method for taking delivery could be an unstated and assumed agreement of the parties that was "so clearly within the contemplation of the parties that they deemed it unnecessary to express it."

¶ 25 We must note that Texas courts avoid construing a contract in a manner which makes performance impossible.[39] Texas

---

in the future can be actionable fraud, a plaintiff must plead and prove that at the very time such promise was made the one making the promise did not intend to carry it out. *Torres v. State*, 605 S.W.2d 394, 396 (Tex.Civ.App.-Beaumont 1980, no writ). No fraud claim is before this Court.

37. *See, e.g., Eastern States Petroleum Co. v. Port Terminal R. Ass'n*, 161 S.W.2d 539, 541 (Tex.Civ. App.-Galveston) ("The spur track, which was the subject of the agreement in the instant case, was not constructed for the use of the public; it was not upon the railroad's right of way, and the railroad was under no duty to construct it or to maintain it for the use of the public after it was constructed; it was not available for the public for transportation...."); *Central of Georgia Ry. Co. v. Woolfolk Chemical Works, Limited*, 122 Ga.App. 789, 178 S.E.2d 710, 717 (1970) (Railway is under no obligation to provide a sidetrack where a private business desires the railway to

construct a spur or sidetrack to its establishment over its private property so that more conveniently and economically it may handle its shipments.).

38. The question whether building a spur was part of an unstated or implied agreement is slightly different from the argument that building the spur was a contractually assumed risk of an unanticipated event where performance is not excused even when it depends upon a future act by a third party. The latter argument is treated herein in the context of the "delivery" required by the contract.

39. *Temple–Eastex, Inc. v. Addison Bank*, 672 S.W.2d 793, 798 (Tex.1984) ("If two constructions are possible, a construction rendering the contract possible of performance will be preferred to one that renders its performance impossible or meaningless."); *Republic National Bank*

courts discuss the timing of the impossibility, the knowledge of the parties, and the reason for the impossibility as important factors when adjudicating whether a promise is enforceable.

In considering impossibility of performance we must distinguish between original impossibility and supervening impossibility. The former is impossibility of performance existing when the contract was entered into, so that the contract was to do something which from the outset was impossible; whereas supervening impossibility is that which develops sometime after the inception of the contract. The Restatement of Contracts also distinguishes between subjective impossibility and objective impossibility. Section 455 of the Restatement provides that impossibility of performing a promise that is not due to the nature of the performance but wholly to the inability of the individual promissor neither prevents the formation of the contract nor discharges a duty created by a contract. Section 456 states that except as stated in Section 455, or where a contrary intention is manifested, a promise imposes no duty if performance of the promise is impossible because of facts existing when the promise is made of which the promissor neither knows nor has reason to know.[40]

In February 2008, when the parties agreed for Lincoln Farm to load railway cars, the NKCR was allowing loading on the main line, and the record on summary adjudication that is before us fails to show that either Lincoln Farm or FTC knew of had reason to know that the NKCR would later stop the practice of loading on the main line and that a spur would be needed for railway loading the following September. In February 2008, loading on railway cars and accepting delivery was not only possible, but a practice that had occurred for several years by FTC.

¶ 26 A few non-precedential Texas appellate opinions have discussed the Restatement of Contracts and the impossibility of performance of a contract after it has been executed.[41] Generally, they have indicated there is a difference between 'the thing cannot be done' and 'I cannot do it.' The first of these is referred to as objective impossibility and the second as subjective impossibility. The statement, 'I cannot do it,' never relieves the promisor, the reason being that the promisor has agreed and definitely bound himself to perform, and cannot be heard to say otherwise. In appellate opinions with precedential value, Texas courts have applied the Restatement (Second) of Contracts, which speaks in terms of impracticability of performance rather than impossibility.[42]

¶ 27 Neither party expressly relies upon application of either the First or Second Restatement of Contracts, or upon the doctrines of impossibility or commercial impracticability as applied by Texas Courts.[43] In the case before us, Lincoln Farm has maintained that it has always had the ability to load railway cars or trucks, and FTC failed to provide the

of *Dallas v. Northwest National Bank of Fort Worth*, 578 S.W.2d 109, 115 (Tex.1978) (same).

**40.** *Janak v. FDIC*, 586 S.W.2d 902, 906–07 (Tex. Civ.App.-Houston [1st Dist.] 1979, no writ).

**41.** *Hollis v. Gallagher*, No. 03–11–00278–CV, 2012 WL 3793288 (Tex.App.-Austin Aug. 28, 2012); *Johnson v. Johnson*, No. 02–10–00296–CV, 2011 WL 3426223 (Tex.App.-Fort Worth Aug. 2, 2011, no pet.).

**42.** *See, e.g., Chevron Phillips Chem. Co., L.P. v. Kingwood Crossroads, L.P.*, 346 S.W.3d 37, 52 (Tex.App.-Houston [14th Dist.] 2011, pet. denied) quoting *Restatement (Second) of Contracts* § 261 (1981) ("Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, its duty to render that performance is discharged, unless the language or the circumstances indicate the contrary."). *Accord, Miller v. Mills Constr., Inc.*, 352 F.3d 1166, 1172–1173 (8th Cir.2003).

**43.** Although the parties discuss commercial impracticability as it relates to U.C.C. §§ 2–614, 2–615, they do not discuss these provisions as they relate to Texas law on objective and subjective impossibility, or the application of the Restatement (First) of Contracts or the Restatement (Second) of Contracts to the controversy before the Court. Because our holding is based upon the unambiguous nature of the language in the contract with the conclusion that Lincoln Farm did not breach the contract when it did not build a rail spur, we need not request briefs from the parties on these issues or attempt to apply them to this controversy.

railway cars for loading due to a decision by the NKCR to not allow parking cars on the main line. Lincoln Farm's approach is that FTC, as buyer and shipper of the potatoes who leases the railway cars and uses the NKCR for its shipping, must be held to have assumed the risk that the main line would not be available. FTC's main approach to the litigation is that Lincoln Farm made an unconditional and absolute promise to load potatoes on railway cars, and Lincoln Farm must be held to have assumed the risk that the NKCR would not provide Lincoln Farm with access to its main line for loading, and that Lincoln Farm is responsible for taking reasonable steps to fulfill its promise to load, and those steps include building a private spur. In sum, FTC argues for a well-known Texas standard "that one who unconditionally obligates himself to do a thing possible of performance, must be held to perform it." [44] According to FTC, loading by rail was possible if Lincoln Farm built a spur, so Lincoln Farm should have built one to satisfy the obligation for loading on a railcar. Lincoln Farm does not agree that the well-known standard creates an obligation for it to build a spur.

¶ 28 On summary adjudication, FTC was required to show that the language "Seller agrees to load potatoes on trucks or railcars furnished by Buyer" to be a *unambiguous* promise in February 2008 *"under that contract"* that Lincoln Farm would provide a facility that was capable to ship the 2008 crop by rail even if Lincoln Farm had to modify that facility to comply with then unknown conditions not yet imposed by the railway on Lincoln Farm. The issue of whether the language is unambiguous presents a question of law relating to the parties' intent.

¶ 29 A Texas court's primary objective when interpreting a contract is to ascertain and give effect to the intent of the parties as it is expressed in the contract.[45] The courts determine the parties' intent *at the time the contract was created.*[46] If the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, then the contract is ambiguous.[47] An ambiguous contract creates an issue of fact on the parties' intent that must be submitted to the trier of fact.[48] *A contract is not ambiguous if it can be given a definite or certain meaning as a matter of law,*[49] so that all provisions are harmonized and given effect so that none will be rendered meaningless.[50]

¶ 30 *Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered,*[51] and "The Texas Supreme Court has held that a court may conclude that a contract is ambiguous even in the absence of such a pleading by either party."[52] In other words, the issue of the existence of an ambiguous contract may be examined by a court *sua sponte; i.e.,* judicial

---

**44.** *Ellwood v. Nutex Oil Co.,* 148 S.W.2d 862, 864 (Tex.Civ.App.-El Paso 1941, writ ref.).

**45.** *Seagull Energy E & P, Inc. v. Eland Energy, Inc.,* 207 S.W.3d 342, 345 (Tex.2006).

**46.** *DaimlerChrysler Motors Co. v. Manuel,* 362 S.W.3d 160, 179 (Tex.App.-Fort Worth 2012, no pet.).

**47.** A contract is ambiguous only if it is subject to two or more reasonable interpretations after applying the pertinent rules of construction. *Certain Underwriters at Lloyd's v. KKM Inc.,* 215 S.W.3d 486, 491 (Tex.App.-Corpus Christi 2006, pet. denied) citing *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 589 (Tex.1996) and *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 229 (Tex.2003).

**48.** *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 589 (Tex.1996).

If a contract is ambiguous, a fact issue exists on the parties' intent that may be properly submitted to the trier of fact. *Certain Underwriters at Lloyd's v. KKM Inc.,* 215 S.W.3d at 491 citing *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d at 229 and *Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.,* 121 S.W.3d at 746.

**49.** *Columbia Gas Transmission Corp.,* 940 S.W.2d at 589.

**50.** *Certain Underwriters at Lloyd's v. KKM Inc.,* 215 S.W.3d at 491.

**51.** *Columbia Gas Transmission Corp.,* 940 S.W.2d at 589. This standard is consistent with our standard of review discussed in Part II of the opinion herein.

**52.** *Certain Underwriters at Lloyd's v. KKM Inc.,* 215 S.W.3d at 490.

enforceability of a contract in Texas includes an analysis of whether the contract to be enforced is unambiguous. When a contract is unambiguous, interpretation of the written instrument is a question of law for the court.[53]

■ ¶ 31 Although FTC and Lincoln Farm construe their obligations under this contract quite differently, a contract is not ambiguous merely because the parties disagree on its meaning.[54] Again, "[a]n ambiguity exists only if the contract language is susceptible to two or more reasonable interpretations"[55] at the time the contract was created, and we look to see that all provisions are harmonized and given effect so that none are rendered meaningless. Looking at the contract as a whole and upon consideration of the record before us, it is clear that at the time the Agreement was created in February 2008, the contractual language unambiguously states that the parties intended for FTC to furnish railway cars to be parked on the main line of the NKCR, and for Lincoln Farm to load on FTC's railway cars those potatoes that had previously been harvested and piled in the storage facility by Lincoln Farm. The parties' intent was to use a railway track owned, operated, and under the control of the NKCR. In sum, the contract between Lincoln Farm and FTC incorporated the availability of certain services provided by a commercial carrier. The contract also unambiguously states that FTC promises to furnish railcars or trucks for Lincoln Farm to load.

### IV. Delivery

■ ¶ 32 FTC's position is that even if Lincoln Farm and FTC agreed to use the main line of the railway, once Lincoln Farm was notified that a spur would be needed for rail delivery then Lincoln Farm had an obligation to build a spur as a reasonable condition to fulfill its obligation for loading railway cars furnished by FTC. FTC argues that failure of delivery occurred because Lincoln Farm could not load potatoes in railway cars parked on the main line of the NKCR and had not taken the reasonable action of building a private rail spur. On the other hand, Lincoln Farm's position is that loading of potatoes on railway cars did not occur because FTC failed to supply railway cars for loading at the storage facility. Further, because FTC was both buyer and shipper it was the party responsible for taking reasonable steps to provide either railway cars of trucks for loading. One issue presented by the parties is did failure of delivery occur because FTC failed to furnish either railway cars or trucks, or did failure occur because Lincoln Farm declined to build a railway spur?

¶ 33 FTC contends that even if the contract did not require Lincoln Farm to build a rail spur, the contract did require *delivery* of the potatoes on railway cars and Lincoln Farm, "as a necessary consequence of this obligation," was required at its own expense to perform whatever may be necessary to enable Lincoln Farm to fulfill this obligation, even if building a private spur was required. Lincoln Farm responds that contract-specified "delivery" was not on railway cars, but at the storage facility, and that it fulfilled the contract.

¶ 34 The "2008 Purchase Agreement Nebraska Potato Crop" does not contain the word "delivery." However, it does use the term "deliver" twice.

(E) The approximate quantity of potatoes set out on page 1 will be delivered and piled by Seller into Seller's storage which is located in or near Wallace Nebraska. Seller will remove anything that will affect the flow of air through the potatoes. How-

---

**53.** *DaimlerChrysler Motors Co. v. Manuel*, 362 S.W.3d 160, 170 (Tex.App.-Fort Worth 2012, no pet.) citing, *MCI Telecomm. Corp. v. Tex. Util. Elec. Co.*, 995 S.W.2d 647, 650–651 (Tex.1999) *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983); *Heil Co. v. Polar Corp.*, 191 S.W.3d 805, 809–10 (Tex.App.-Fort Worth 2006, pet. denied). This standard is consistent with our standard of review discussed in Part II of this opinion.

**54.** *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d at 345, citing *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 727 (Tex. 1981).

**55.** *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d at 345, citing *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003).

ever, Buyer may at its option, load potatoes direct from the field.

(N) If Seller fails to deliver the Contracted Potatoes as a result of a sale to a third party; such failure to deliver shall be an event of default by seller, in which case, Seller shall be indebted to Buyer to the extent of any amounts advanced by Buyer and, in addition, Seller shall be indebted to the Buyer in a liquidated sum equal to 125% of price paid by Buyer to replace the approximate CWT of potatoes as set forth in this Agreement under quantity.

Lincoln Farm argues that delivery occurred when the potatoes were "delivered" or piled in the storage building. Thus, Lincoln Farm argues that loading was a contractual duty after delivery.

¶ 35 The term "delivery" is a term with meaning in the Commercial Code of Texas. For example, the Texas Business and Commerce Code, which contains Texas' version of the Uniform Commercial Code, provides that title to goods passes to the buyer at the time and place the seller completes performance regarding the physical delivery of the goods.[56] Generally, delivery may be actual or constructive. Delivery *may* be a mixed issue of fact and law.[57] In the controversy before us we are asked to construe language in a contract where facts are not in dispute, the only dispute presented by the parties is the meaning of unambiguous language in the contract, and the issue presented is a question of law.[58]

¶ 36 While actual delivery consists in the giving real possession to the vendee or his servants or special agents who are identified with him in law and represent him, a constructive delivery of goods sold may be substituted for an actual delivery when in pursuance of agreement by the parties, or an established custom, and where by construction of law the agreement, custom, or acts of the parties are equivalent to acts of real delivery.[59] Was Lincoln Farm's act of piling the potatoes in its storage facility constructive delivery to FTC? We think not.

¶ 37 Lincoln Farm had to plant, grow, harvest, and store the potatoes in the storage building prior to loading. In this appeal, there are no facts with supporting authority to show that possession, actual or constructive, or that title to the potatoes,[60] or risk of loss, passed to FTC when the potatoes where piled in the storage facility on Lincoln Farm's property. The contract specifies that payment to Lincoln Farm from FTC is based upon *the amount* of potatoes "per CWT loaded in railcars or trucks plus or minus . . . ." Viewing the contract as a whole, Lincoln Farm would have "completed performance regarding the physical delivery of the goods" when it loaded the potatoes on railway cars or trucks furnished by FTC at Lincoln Farm's property.

56. *NXCESS Motor Cars, Inc. v. JPMorgan Chase Bank, N.A.*, 317 S.W.3d 462, 466 (Tex.App.-Houston [1st Dist.] 2010, pet. denied) citing Tex. Bus. & Com.Code Ann. § 2.401(b) (Vernon 2009).

57. *McClure v. JPMorgan Chase Bank*, 147 S.W.3d 648, 655 (Tex.App.-Fort Worth 2004, pet. denied).

58. *Adkins–Polk Co. v. John Barkley & Co., Limited*, 297 S.W. 757, 761 (Tex.Civ.App.-El Paso 1927, writ dism'd) ("The question of delivery is determined by the facts, and when the facts as to delivery are undisputed, as here, delivery becomes a question of law."). This standard is consistent with our standard of review discussed in Part II of this opinion.

59. *H.O. Anderson, Inc. v. Rose*, 177 W.Va. 419, 352 S.E.2d 541, 548 (1986). *See also Lakeview Gardens, Inc. v. Kansas*, 221 Kan. 211, 557 P.2d 1286, 1290 (1976) ("Delivery may be either actual or constructive. Constructive delivery is a general term comprehending all those acts which, although not truly conferring a real possession on the vendee, have been held by construction of law equivalent to acts of real delivery."). *Accord, Hubbell, Slack & Co. v. Farmers' Union Cotton Co.* (Tex.Civ.App.) 196 S.W. 681, 685 (Tex.Civ.App.-Beaumont 1917, writ ref'd) (Court discussed constructive possession, constructive delivery, and actual delivery).

60. Pursuant to the common law, at the time of the potato sale agreement the potatoes were not at that time in the possession of the seller and no title to the potatoes passed at that time. *See Owens v. Clark*, 78 Tex. 547–550, 15 S.W. 101, 102 (1890) ("By the common law, if the seller make a proposition, and the buyer accept, and the goods are in the possession of the seller, and nothing remains to be done to identify them, or in any way prepare them for delivery, the sale is complete, and the property in the goods passes at once."). Lincoln Farm had to harvest and store the potatoes for delivery before title passed.

¶ 38 Delivery by rail was prevented by the NKCR declining to provide the main line for parking the railway cars. Texas court opinions clearly explain that if the contract, properly construed, shows that the promisor assumed the risk of unanticipated events, the occurrence of such events does not excuse performance.[61] Further, that even if a party contracts to render a performance that depends on some act by a third party, he is not ordinarily discharged because of a failure by that party because this is also a risk that is commonly understood to be on the obligor.[62] Does the contract, properly construed, show that Lincoln Farm assumed the risk of the unanticipated event of non-availability of the main line for the NKCR? Also, does the contract, properly construed, show that FTC assumed the risk of the unanticipated event of non-availability of the main line for the NKCR?

¶ 39 We agree with FTC that the contract unambiguously required Lincoln Farm to load potatoes on trucks or railcars furnished by FTC, and that delivery would occur at that time. However, we disagree with FTC that delivery upon loading necessarily means that Lincoln Farm assumed the risk of the unanticipated event of non-availability of the main line for the NKCR and thus breached the agreement by not providing a rail spur. A contract is construed to determine wheth-er a party unconditionally obligated itself to do a thing possible of performance, and if so, then it must be required to perform it.[63] This analysis requires an initial determination that building a rail spur was a "necessary consequence" to fulfill a contractual obligation to load trucks or railcars. More specifically, was building a private rail spur a "necessary consequence" for a seller who agrees to load its goods on railway cars provided by the buyer and operated on a railway owned by a third party? What is a *necessary* consequence is based upon the contractual obligation and the circumstances. We are not presented with a contract which specifies that delivery will be *solely* by railway in the context of a party knowing that railway facilities on its own property must be provided in order for that sole delivery method to be effected. Further, we are not presented with a contract which gave discretion to select a railway delivery to the exclusion of truck delivery when railway delivery was unavailable.[64]

¶ 40 Lincoln Farm argued that it was able to timely load at the storage facility all of the contract-specified potatoes on trucks to be furnished by FTC. FTC argues that it had the option to send either trucks or railcars for loading the potatoes and require Lincoln to provide whatever was necessarily required

**61.** *Chevron Phillips Chem. Co., L.P. v. Kingwood Crossroads, L.P.*, 346 S.W.3d at 52, citing *Robberson Steel, Inc. v. J.D. Abrams, Inc.*, 582 S.W.2d 558, 561 (Tex.Civ.App.-El Paso 1979, no writ).

**62.** *Chevron Phillips Chem. Co., L.P. v. Kingwood Crossroads, L.P.*, 346 S.W.3d at 53, citing *Toyo Cotton Co. v. Cotton Concentration Co.*, 461 S.W.2d 116, 118 (Tex.1970) ("One who contracts to render a performance or produce a result for which it is necessary to obtain the co-operation of third persons is not excused by the fact that they will not cooperate. This is a risk that is commonly understood to be on the promisor, in the absence of a provision to the contrary....").

**63.** *Ellwood v. Nutex Oil Co.*, 148 S.W.2d at 864.

FTC relies upon an opinion without precedential value for the proposition that a seller must perform whatever is necessary to enable the seller to perform the seller's obligation. FTC Answer Brief, at 12, citing *Tejas Power Corp. v. Amerada Hess Corp.*, No. 14–98–00346–CV, 1999 WL 605550, at *2 (Tex.App.-Houston [14th Dist.] Aug. 12, 1999, no pet.) (not designated for publi-cation). Under Texas Rules, RAP, Rule 47.7, unpublished opinions have no precedential value but may be cited with the notation Not Designated for Publication. We conclude that the language in opinions such as *Chevron Phillips Chem. Co., L.P. v. Kingwood Crossroads, L.P.*, 346 S.W.3d at 52–53 and *Ellwood v. Nutex Oil Co.*, 148 S.W.2d at 864 explain Texas law.

**64.** We also note that the quotation used by FTC is followed with: "However, the common law of contracts also recognizes that an 'extraordinary circumstance may make performance so vitally different from what was reasonably to be expected as to alter the essential nature of that performance.' Thus, impossibility or impracticality of performance due to the unforeseen failure of a presupposed condition may excuse the seller's breach." *Tejas Power Corp. v. Amerada Hess Corp.*, No. 14–98–00346–CV, 1999 WL 605550, at *2, not designated for publication. Because we hold that the partial summary adjudication failed to show a breach by Lincoln Farm, we need not address defenses of impossibility or impracticality of performance as such could hypothetically apply to Lincoln Farm.

by method of delivery selected. In sum, FTC's argument rests upon the idea that "Seller agrees to load potatoes on trucks or railcars furnished by buyer" means that "Seller agrees to load potatoes on railcars if that is the delivery method Buyer chooses even if railcars may not be used until Seller builds a rail spur."

¶ 41 The express language of the contract specified two methods of delivery to FTC, one using the NKCR main line for delivery on railway cars furnished by FTC, and another using trucks furnished by FTC. We would be inclined to agree, in part, with FTC that the language "trucks or railcars furnished by buyer" could be interpreted to mean the buyer has complete discretion for selection for a delivery method *if the phrase "at Buyer's option" were not found in other provisions of the contract.*[65] Lincoln Farm argues that the phrase "at Buyer's option" appears twice in the contract, once for the date of delivery and once for a "Buyer's option" for loading potatoes directly from the potato fields. Lincoln Farm argues that no "at Buyer's option" existed for FTC to insist on one, and only one, method of delivery. Lincoln Farm also points to an appellate opinion and language in a contract such as delivery is "to be made by rail unless otherwise agreed" for an example of contractual language that FTC should have bargained for, but did not, if it wanted to possess the sole discretion to select rail delivery over no delivery at all.[66]

¶ 42 In the trial court, FTC relied on the deposition of Fred Helper, a representative for Lincoln Farm, for the proposition that FTC possessed an option for delivery by either railway cars or trucks.[67] He agreed that FTC, as the buyer, had the option to either haul the potatoes away in trucks or by rail. He also stated that it was Lincoln Farm's obligation to load trucks or rail cars, but it was not Lincoln Farm's obligation to build a spur. When asked why Lincoln Farm built a spur, he stated that "As I best recollect, it was that we were not allowed to load potatoes directly onto the rail line and would have to build a spur in order to load potatoes on rail."[68] He also stated that his reading of the contract indicated that it was Lincoln Farm's contractual obligation to load trucks and railcars, but not to "provide the facilities for rail cars" or "provide the trucks."[69] He agreed that FTC had an option to deliver one or the other, truck or railcar, but he did not state that FTC had the option to deliver one at the exclusion of another *while delivering neither.* The record does not support the idea that Lincoln Farm understood that FTC had a contractual right to insist on railway car delivery to the exclusion of trucks when the former became impossible on the main line. Although a spur was built by Lincoln Farm, the record before us does not show an intent on the part of Lincoln Farm to build a spur because FTC possessed a discretionary right to *insist on delivery by rail to the exclusion of delivery by trucks if the main line rail was not available.*

¶ 43 The contract, taken as a whole, is not silent on Buyer's options to be exercised pursuant to the terms of the contract. It provides such options for Buyer in two provisions of the contract, and neither includes the specific provision that Buyer has the sole

---

**65.** In the absence of an express "Buyer's option" term in a contract, as we have before us, a reasonable interpretation of the disputed language could support both parties' arguments on the presence or absence of sole discretion, or a "Buyer's option." However, such an ambiguity would present an issue for the trier of fact, and would require reversal of the summary adjudication in Texas. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d at 589; *Certain Underwriters at Lloyd's v. KKM Inc.,* 215 S.W.3d at 491.

**66.** Lincoln Farm's Brief-in-Chief, at 22–23, citing *Jon–T Chemicals, Inc. v. Freeport Chemical Co.,* 704 F.2d 1412, 1415–1416 (5th Cir.1983)

(contract that delivery of phosphoric acid was to be made "by rail unless otherwise agreed" meant that in the absence of a mutual agreement for substitute delivery by truck, the party, Jon–T, had no contractual right, or right pursuant to the Texas version of the U.C.C., to require delivery by truck when railcars were unavailable).

**67.** FTC's Reply, O.R. at 944, 947, citing Exhibit 4, p. 63, line11; p. 64, line 4; p. 67, line21 to p. 68 line 2; p. 70, lines 12–17; p. 114, lines 12–14.

**68.** FTC's Reply, Exhibit 4, pg. 103, O.R. at 983.

**69.** *Id.* Ex. 4, pg. 68, O.R. at 981.

discretion to provide either railway cars or trucks to the exclusion of either when fulfilling its obligation to take delivery. The contract as a whole, as it relates to the specific provision for Buyer-provided trucks and railway cars, is thus an example that is *similar*[70] to one maxim of contract construction used by courts in Texas: the maxim *expressio unius est exclusio alterius*—literally "the specific mention of one is the exclusion of the other."[71] Here, the parties expressly contracted on two provisions of the contract to include "at Buyer's option" and they did not include such language in the provision relating to delivery. We conclude that the contract required FTC as buyer to furnish "trucks or railcars" to Lincoln Farm for loading the potatoes. If FTC did not furnish railway cars for loading at the potato storage building, then supplying trucks was a contract-required method for delivery, and building a spur by Lincoln Farm was not *required* "under the contract" to fulfill its obligation of delivery. Lincoln farm did not breach the contract when it informed FTC that it was ready to load the potatoes on trucks in the absence of a working private rail spur.

¶ 44 Further, the record before us indicates that FTC had used the main line for several years for railway cars it provided for shipping the potatoes, it knew that the main line was not on the property of Lincoln Farm, and it based the 2008 agreement on agreements it had made with the Oppligers in previous years. There is no allegation that Lincoln Farm paid any amounts to the NKCR for the use of its railway or for leasing railway cars. Although Lincoln Farm loaded the potatoes on the railway cars leased by FTC, the record before us shows that FTC was the party actually using the NKCR main line and railway cars to accept delivery and ship its potatoes, *and that this use of the NKCR line and railcars was the contractual obligation incurred by FTC.* The contract is clear that it is FTC, and not Lincoln Farm, that assumed the risk of the unanticipated event of non-availability of the main line for the NKCR.

¶ 45 FTC argues that Lincoln Farm raised the Uniform Commercial Code (U.C.C.) §§ 2–614, 2–615, as defenses to FTC's motion for summary judgment. In the trial court and on appeal, Lincoln Farm has argued that these sections were raised by Lincoln Farm to show the analysis needed for FTC to excuse FTC's performance, and that these provisions were not raised by Lincoln Farm to excuse its own performance; *i.e.,* the provisions were invoked for arguments concerning the alleged duties of FTC.[72]

¶ 46 Lincoln Farm argues that in June, 2008, an agreed type of carrier became unavailable when the NKCR informed Lincoln Farm that loading could not occur on the

---

**70.** Texas courts have stated that this maxim means that even though contract terms would have been implied when absent, the expression of a class implies the exclusion of other terms that would have been implied. *In re Estate of Anderegg,* 360 S.W.3d 677, 681 (Tex.App.El Paso 2012) (same). In a strict sense, those "other terms" may not include "buyer's option" or "seller's option" as implied terms to all provisions of a contract that are silent as to such terms. One reason for this limitation on application of such terms is that implying their application universally to every provision in a contract would create a lack of mutuality of obligation, *i.e.,* an unenforceable illusory contract. *See, e.g., City of The Colony v. N. Tex. Mun. Water Dist.,* 272 S.W.3d 699, 725 (Tex.App.-Fort Worth 2008, pet. dism'd), (lack of mutuality in obligation creates an illusory contract and is unenforceable).

**71.** *See, e.g., Texas Bd. of Chiropractic Examrs. v. Texas Med. Ass'n,* 375 S.W.3d 464, 482 n. 24 (Tex.App.-Austin 2012, pet. denied), citing *Liberty Mut. Ins. Co. v. American Emp'rs Ins. Co.,* 556

S.W.2d 242, 245 (Tex.1977) (proposition that construction of a contract may include the canon of statutory construction known as *expressio unius est exclusio alterius* ); *In re Estate of Anderegg,* 360 S.W.3d 677, 681 (Tex.App.El Paso 2012) (same).

**72.** Section 2–614 of the U.C.C. is identical to Section 2.614 of the Texas Business and Commerce Code. *Virginia Power Energy Mktg., Inc. v. Apache Corp.,* 297 S.W.3d 397, n. 9, 404 (Tex. App.-Houston [14th Dist.] 2009, pet. denied) ("Section 2.614 of the Business and Commerce Code is identical to UCC section 2–614.").

Section 2.614 provides in part, that: "Where without fault of either party the agreed berthing, loading, or unloading facilities fail or an agreed type of carrier becomes unavailable or the agreed manner of delivery otherwise becomes commercially impracticable but a commercially reasonable substitute is available, such substitute performance must be tendered and accepted." Tex. Bus. & Comm.Code Ann. § 2.614(a) (Vernon 2009).

main line as had previously occurred, including the 2007 crop which had completed loading in May 2008. Lincoln Farm argued that the contract could still be performed with FTC furnishing trucks for loading. FTC allegedly told Lincoln Farm that trucks were not an available method for delivery.

¶ 47 The record before us clearly shows that Lincoln Farm's citations to U.C.C. §§ 2–614 & 2–615 were used in arguments that were proleptic in nature; *i.e.,* arguments in the nature of anticipation and answering arguments before one's opponent has put them forward. Lincoln Farm's arguments relate to its claims that FTC breached the potato sales agreement. FTC argues on appeal that the trial court could have ruled against Lincoln Farm without considering U.C.C. §§ 2–614, 615. Whether FTC breached the potato sale agreement is not before us on reviewing a partial summary adjudication determining that Lincoln Farm breached the agreement. First, Texas courts use the "same transaction or occurrence" language for defining a cause of action,[73] and any potential non-jurisdictional defenses FTC may or may not possess to Lincoln Farm's cause of action are part of that cause of action for the purpose of an adjudication, and they may not be raised for the first time on an appeal.[74] Second, Texas courts do not render advisory opinions because (1) such opinions do not involve a justiciable controversy, (2) they are beyond the jurisdiction of those courts since they decide abstract questions of law, and (3) they are prohibited under the Texas and federal constitutions as construed by those courts.[75] In sum, any cause of action against FTC and any defenses that are part of that cause of action are not before us in this appeal, including application of U.C.C. §§ 2–614, 2–615.

## V. Conclusion

¶ 48 We hold that the unambiguous language of the 2008 Purchase Agreement for the potato crop required FTC to provide railcars or trucks for taking delivery of the potatoes from Lincoln Farm. We hold that the unambiguous language of that agreement did not give FTC a right to demand delivery by rail as the sole method for delivery; and as a consequence of that holding, we hold that Lincoln Farm did not breach the 2008 Purchase Agreement for the potato crop when it did not build a private railway spur on its property for taking FTC's railways cars from the main line of the NKCR until January, 2009. The questions presented by the parties on the application of U.C.C. §§ 2–614, 615, are not properly before us for adjudication in this appeal. The only issue before us in this appeal is whether Lincoln Farm breached the potato purchase agreement when it did not build a rail spur until January 2009.

¶ 49 The trial court's order on partial summary adjudication adjudicating that Lincoln Farm breached the 2008 potato sale agreement is reversed, and the cause is remanded to the District Court for further proceedings consistent with this opinion.

¶ 50 COLBERT, C.J., REIF, V.C.J., KAUGER, WATT, WINCHESTER, EDMONDSON, TAYLOR, COMBS, JJ., concur.

¶ 51 GURICH, J., recused.

**73.** *Brewster v. Columbia Med. Ctr. of McKinney Subsidiary, L.P.,* 269 S.W.3d 314, 317–318 (Tex. App.-Dallas 2008, no pet.) ("A 'transaction' is defined as a set of facts that gives rise to the cause of action premised thereon."); *Texas Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.,* 219 S.W.3d 563, 587 (Tex.App.-Austin 2007, pet. denied.) (Court applied language that is quoted in *Brewster* in the context of explaining the relation-back doctrine and a statute of limitations for new, distinct, or different transactions or occurrences.).

**74.** *In re E.R.,* 385 S.W.3d 552, 567, n. 27 (Tex. 2012) (an affirmative defense may not be raised for the first time on appeal); *Blackard v. Fairview Farms Land Co., Ltd.,* 346 S.W.3d 861, 870 (Tex.App.-Dallas 2011, no pet.) (To preserve a complaint for appellate review, a party generally must present it to the trial court by timely request, objection, or motion stating the specific grounds, and obtain a ruling.).

**75.** *Transportation Ins. Co. v. WH Cleaners, Inc.,* 372 S.W.3d 223, 227 (Tex.App.-Dallas 2012, no pet.); *Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 444 (Tex.1993).